UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JEFFREY A. HARGETT,

    Plaintiff,

                              08-3133

CAROL ADAMS et al.,

    Defendants.

### Order

The plaintiff claims that he was discriminated against because of his disability (morbid obesity) in violation of the Americans with Disabilities Act and the Rehabilitation Act. He seeks declaratory relief and compensatory damages.

Specifically, the plaintiff claims that the defendants deprived him of his core group therapy treatment for 45 days when they transferred him from the Joliet Treatment and Detention Facility to the Rushville Treatment and Detention Facility before the other core group therapy members were transferred. (Complaint, ¶¶ 16, 19-23). The plaintiff maintains that he was prematurely transferred because of his obesity, denying him access to his core group treatment, while other core group members were able to continue participating in the therapy.

Before the court is the defendants' summary judgment motion, which is granted. Even assuming for purposes of this order that the plaintiff's obesity is a disability under the ADA, the accommodations sought by the plaintiff were unreasonable. There were no reasonable accommodations available which would have enabled the plaintiff to stay back with the other core group members. Accordingly, there is no ADA violation.

*Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." *Anderson*, 477 U.S. at 248. A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

*Facts*

1. The plaintiff is morbidly obese. He is 6' 4" tall and, during relevant times, weighed over about 480-490 pounds. He is and at relevant times was being detained in a DHS treatment facility pursuant to the Illinois Sexually Violent Persons Act.

2. The plaintiff was originally housed in the Joliet Treatment and Detention Center. There, he was a member of "core group therapy" which he describes as "15 hours per week of intensive sex-offender-specific treatment in a group setting." Generally, core group members were housed in the newest building at Joliet, it appears as an incentive to participate. The plaintiff's size, however, precluded him from residing in the new building, because there was no room in that building large enough for him and his bed. Instead, the plaintiff stayed in one of the older buildings at Joliet in a larger room, with a separate bathroom and a larger bed. The plaintiff asserts that the new building was not built to ADA requirements, which is why he was unable to stay there.

3. The Joliet facility was overcrowded. At some point, it was determined that all the residents at Joliet would be moved to a facility in Rushville, Illinois. In September of 2005, Defendant Monahan took on the job of coordinating that move. The move occurred in three phases over the Summer of 2006. After the move, Monahan acted as Rushville's Administrator until March, 2007.

4. The move presented staffing and security challenges. These concerns precluded moving all the residents at one time, so they were instead moved in three stages.

5. Not all the guards at Joliet (called "Security Therapy Aids") were making the move to Rushville. The initial staff at Rushville consisted of a few experienced guards and several newly hired guards who were still being trained.

6. The same staffing challenges arose with the personnel providing clinical services to the residents. Clinical services decreased at both the Joliet and Rushville facilities during the weeks of the move.

7. The first group to move to Rushville was a small group of employees who helped get the facility ready. The second group were the residents housed in the oldest building at the Joliet facility, where the plaintiff was. The residents from the oldest building were moved first

because that building was old and overcrowded. Because the plaintiff resided in the old building, he was moved to Rushville with the first wave of residents on or about June 19, 2006.

8. The second and last wave of residents moved were those housed in the newest building at Joliet, which included most of the core group therapy members. Three or four of the core group members had volunteered to move to Rushville with the first wave and had signed waivers when they left, stating that they were doing so voluntarily. The plaintiff refused to sign a waiver because he wanted to stay at Joliet and participate in core group therapy with the others. After the first wave of residents moved, core group therapy continued at Joliet in the new building, but with reduced hours (the record does not reflect how much). (Gustufson Aff. para. 6, d/e 47, p. 21, and other following affidavits). The plaintiff was unable to participate because he had been moved to Rushville with the first wave of residents.

9. The second wave of residents were transferred to Rushville on August 9, 2006. The plaintiff was therefore unable to participate in core group therapy from June 19, 2006 until August 9, 2006. (Plaintiff's Dep. p. 62).

10. Joseph Proctor, Psy.D. is a licensed psychologist and was the only clinician to move with the first residents at Rushville. He provides group and individual therapy and crises management.

11. At Rushville, the plaintiff was provided with one hour per week of individual therapy while he waited for the other core group members. The plaintiff maintains that this therapy was not "sex offender specific."

12. In addition to the one hour per week of individual therapy, the plaintiff participated in a group called "motivated to change" for 1 ½ hours per week. The defendants characterize this as group therapy, but the plaintiff maintains that it was solely to orient new members to core group therapy.

13. The plaintiff was able to work on his "genogram" while waiting on his core group members, which was one of his core group assignments.

14. The plaintiff acknowledges that the newer building at Joliet had no cells big enough for his bed. He contends that he should have been allowed to stay in one of two empty rooms in the new building that were not cells, which he asserts would have been big enough for his bed. Neither of those rooms, however, had running water or a toilet. Alternatively, he asked to stay in a regular cell in the new building and sleep on a mattress on the floor, but the plaintiff admits that he would have had difficulty using the toilet and the shower in the regular cells. (Plaintiff's Dep., p. 44, l. 8 - p. 45, l. 3). The plaintiff counters that there was a handicapped accessible toilet and shower in the new building that he could have used. As another alternative, the plaintiff thought that he should be allowed to stay in the old building after the others had left. He was willing to suffer whatever discomfort was necessary in order to continue his group therapy.

15. Dr. Lochard is a licensed physician who is familiar with the plaintiff and who has reviewed

the plaintiff's medical records. In Dr. Lochard's opinion, the plaintiff's obesity does not have an underlying physiological cause. In Dr. Lochard's opinion, the plaintiff is obese because he eats too much high-calorie food.

16. The plaintiff has well-controlled hypothyroidism, which would not cause weight gain. He also has diabetes which is not well controlled because of the plaintiff's eating habits. He also has arthritis in both knees, but Dr. Lochard does not consider that disabling.

17. Plaintiff had left knee arthroscopy on May 4, 2009, which went well, according to Dr. Lochard. The plaintiff has, however, continued to use the wheelchair provided him after the surgery, because walking long distances is difficult. The plaintiff was not using a wheelchair while he was in Joliet. The plaintiff stays in a handicapped cell at Rushville which has a larger bed.

*Analysis*

There is a substantial question whether plaintiff's morbid obesity, which is not the result of any physiological disorder, alone amounted a disability under the ADA. *See EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436 (6th Cir. 2006)(truck driver's 405 pound weight was not impairment under ADA because there was no physiological cause)("to constitute an ADA impairment, a person's obesity, even morbid obesity, must be the result of a physiological condition."); *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997)(Title I ADA claim based on an employer's weight requirements)("except in special cases where the obesity relates to a physiological disorder, is not a "physical impairment" within the meaning of the statutes.").

However, the court need not wade into this thicket, because, even if the plaintiff was a qualified individual with a disability under the ADA, there was no reasonable accommodation that would have allowed him to stay in Joliet after the first wave of residents moved. Moving the plaintiff with the other residents in the old building was necessary because of staffing, security and logistical concerns.

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). A public entity, however, is not required to take actions that "result in undue financial and administrative burdens . . . ." 28 C.F.R. § 35.164.

In *Love v. Westville Correctional Center*, 103 F.3d 558 (7th Cir. 1996), the Seventh Circuit remarked that:

> It is entirely possible that in the prison setting, assuming the ADA applies, the type of accommodation that will be enough to satisfy the statute's reasonableness requirement must be judged in light of the overall institutional requirements. *Cf. Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Security

concerns, safety concerns, and administrative exigencies would all be important considerations to take into account.

103 F.3d at 561.  This statement is dicta, but it makes imminent sense.  The Department of Human Services had a legitimate interest in coordinating the move in a safe, efficient, and cost-effective manner.  That interest is a relevant factor in determining the reasonableness of the accommodations sought by the plaintiff.  Applied in this context, the *Turner* factors are: 1) whether there is a "'valid, rational connection'" between the administrator's action and a legitimate government interest used to justify the action; 2) whether there were "alternative means" for the plaintiff to obtain therapy; 3) the "impact" on the institution's resources, employees and residents if the plaintiff was accommodated; and, 4) whether "ready alternatives" were available.  *Turner v. Safley*, 482 U.S. 78, 89-91 (1987); *see also Phipps v. Sheriff of Cook County*, 681 F.Supp.2d 899, 921 (N.D. Ill. 2009)(acknowledging that 7th Circuit has not yet determined if *Turner* factors apply to ADA reasonableness inquiry, but concluding that, even if they did apply, summary judgment not warranted).  Another important factor in the analysis here is the duration and extent of the deprivation.  A critical point in this case is that the plaintiff went without group therapy for only 6-7 weeks, a relatively isolated and short-lived deprivation necessitated by the exigencies of the move.

Considering these factors, moving the plaintiff to Rushville with the rest of the residents in the old building was rationally related to legitimate logistical concerns of staffing and security.  The old building was crowded and out-of-date; moving those residents first was the obvious choice.  Moving the residents in two different waves, rather than all at once, was necessary because of staffing and security concerns.

The plaintiff does not challenge these decisions, but he asserts that he should have been allowed to reside in the new building after the old building was cleared out.[1]  This accommodation would not have been reasonable.  The plaintiff does not dispute that the only rooms big enough in the new building were not cells and did not have running water or toilets.  The plaintiff would have had to have been deadlocked in the room, and then a security guard would have had to let the plaintiff out every time he needed to use the restroom, and escort him to and from the restroom.  The move already presented problems with staff coverage, and this accommodation would have only exacerbated them.  The same goes for the plaintiff's offer to stay in the old building and have a guard assigned solely to him.  The plaintiff's offer to sleep on a mattress on the floor of a cell in the new building also would have been an unreasonable accommodation.  Even if the plaintiff's mattress fit into the cell, significant problems could arise

---

[1]The plaintiff asserts that there would never have been a problem if the new building had been built to ADA specifications in the first place.  The court does not address this issue because the plaintiff sought no accommodations in the new building until the move.  His accommodations up until that point (staying in the old building in a larger cell) were acceptable to him.  (Plaintiff's Dep. p. 38)(The plaintiff stated that he is not suing over events before June 19, 2006).

5

when he attempted to get down and up off the mattress, given his size, and he admitted that he would have had trouble using the toilet in the cell.

In short, these accommodations would have significantly and negatively impacted the institution's ability to make the move in an efficient, orderly, safe, and cost-effective manner. The court sees no "ready alternatives" on the record. The defendants did what they could to minimize the impact of the move on residents, but the short-staffing affected everyone, even the residents who remained in the new building and had reduced group therapy time.

It is true that the plaintiff was unable to participate in group therapy for 6-7 weeks, while he waited for the second wave of residents. He did, however, have alternatives, though perhaps not as good as the group therapy. He was able to work on his genogram, work on other treatment objectives on his own, and participate in weekly one-on-one therapy. There is no indication that this short term interruption in group therapy had any effect whatsoever on his ability to progress through treatment. The plaintiff's argument otherwise is directly contradicted by his deposition testimony. (Plaintiff's Dep. p. 62-63); *Pourghoraishi v. Flying J., Inc.*, 449 F.3d 751, 759 (7th Cir. 2006).

In sum, the court concludes that the accommodations sought by the plaintiff would have required the defendants to take actions that would have "result[ed] in undue financial and administrative burdens . . . ." 28 C.F.R. § 35.164. For the six-seven weeks during the move, there were no reasonable accommodations that would have allowed the plaintiff to reside in the new building or to remain in the old building after it was cleared out. Accordingly, there is no ADA violation, even if the plaintiff was a qualified individual with a disability.[2]

It is not clear if the plaintiff is pursuing a constitutional claim, but to the extent he is, the Court does not see evidence of any constitutional violation. The court sees no constitutional problem with the conditions of his confinement in either facility, nor any constitutional problem with the mental health treatment he received while waiting for the rest of the core group to arrive at Rushville. The court also sees no equal protection claim. The plaintiff was not denied access to the core group therapy before the move. If he is challenging his placement in the old building to begin with, that decision was rationally related to a legitimate concern that there was no cell in the new building large enough to accommodate his bed and which would allow him to easily use the toilet and sink. As for the move itself, the plaintiff was not similarly situated to the core group members in the new building during the move, because the plaintiff was living in the old building. The plaintiff was treated like all the other residents in the old building—they all

---

[2]"Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of the claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other." *Washington v. Indiana High School Athletic Assoc.*, 181 F.3d 840, 845 n. 6 (7th Cir.1999). The Court therefore does not conduct a separate analysis under the Rehabilitation Act.

moved to Rushville at the same time.  The court understands that the plaintiff felt that it was unfair and unnecessary to interrupt his group therapy during the move, but that does not rise to the level of a constitutional violation.

    IT IS THEREFORE ORDERED:

1)     The defendants' motion for summary judgment is granted (d/e 42).  The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff.  All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs.

2)     If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

Entered this  14th   Day of September, 2010.

                                                s/Harold A. Baker

                                                HAROLD A. BAKER
                                        UNITED STATES DISTRICT JUDGE